FILED

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**    00 MAR 31  PM 5: 05
**JASPER DIVISION**

U.S. DISTRICT COURT
N.D. OF ALABAMA

BOBBY D. HOBBS, LYNN          }
WILLINGHAM, CHRISTOPHER       }
WILLINGHAM, TIMMY BROWN,      }
VALERIE BROWN, WILLIE HOBBS,  }
HENRY HAMILTON, WILLIE J.     }
ABERNATHY, and WILLIE S.      }
ABERNATHY,                    }
                              }
    Plaintiffs,          }
                              }
v.                            }          **CASE NO. CV 96-B-2122-J**
                              }
FONTAINE TRAILER CO., INC.,   }
                              }
    Defendant.           }

**ENTERED**

APR - 3 2000 

## MEMORANDUM OPINION

### I. INTRODUCTION

    Currently before the court is the motion of the defendant, Fontaine Trailer Co., Inc.,

("defendant" or "Fontaine") for summary judgment. Upon consideration of the record, the

submissions of the parties, the argument of counsel, and the relevant law, the court is of the

opinion that defendant's motion is due to be granted in part and denied in part.[1]

    This dispute arises out of plaintiffs' claims that defendant discriminated against them on

the basis of their race in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and

42 U.S.C. § 1981. Plaintiff James E. White ("White") also alleges that defendant violated the

Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq*.

---

    [1]At oral argument on the motion, the court had indicated its intention to grant summary judgment on all claims. The court has now determined that summary judgment is not appropriate with regard to plaintiff Bobby Hobbs's claims that he was subjected to a racially hostile work environment and constructively discharged in violation of Title VII.

## II. FACTS

**A.    Defendant Fontaine**

Fontaine is a Haleyville, Alabama manufacturer of over-the-road, flatbed, low bed, drop

deck trailers.  Fontaine has few minority employees, reflecting the low minority population in the

surrounding geographical area.  (Westmoreland Dep., DX 13, at 16-18, 35-36; McGough Dep.,

DX 10, at 52; C. Willingham Dep., DX 12, at 55-56; Hobbs Dep., DX 7, at 58; Brown Dep., DX

3, at 34-35.)[2]  Other employers in the area have low numbers of minority employees.  (T. Brown

Dep., DX 4, at 85-88; W. Hobbs. Dep., DX 9, at 86.)

When hiring employees, Fontaine uses the services of the Haleyville office of the

Alabama State Employment Service ("local employment office" or "employment office").

(Westmoreland Dep., DX 13, at 18.)  Employment office applicants who apply for jobs

specifically with Fontaine fill out an application that has no reference to the applicant's race.  (*Id.*

at 20.)

Fontaine obtains from the employment office all completed Fontaine employment

applications.  (*Id.* at 22-23.)  Fontaine's director of human resources conducts a preliminary

screening, then discusses promising applicants with the plant or production manager to determine

which applicants to interview.  (*Id.* at 28-31; McGough Dep., DX 10, at 15-16.)

---

[2]Evidentiary citations are to defendant's Evidentiary Materials in Support of Defendant's
Motion for Summary Judgment ("DX"), plaintiff's Evidentiary Submission in Support of Their
Brief in Opposition to Defendant's Motion for Summary Judgment ("PX"), or defendant's
Additional Evidentiary Materials Relied on in Reply to Plaintiffs' Brief in Opposition to
Defendant's Motion for Summary Judgment ("Supp. DX").

From approximately 1980 until he retired on disability at the end of 1995, Wayne Westmoreland ("Westmoreland") was responsible for hiring at Fontaine. (Westmoreland Dep., DX 13, at 15-16.)  According to Westmoreland, for every five available positions, Fontaine may receive up to 300 applicants.  (*Id.* at 106-07, 111-12, 115.)

**B.   Plaintiff Bobby Hobbs**

In 1992, Bobby Hobbs ("Hobbs"), an African American, applied for employment with Fontaine through the local employment office. (Hobbs Dep., PX 12, at 135.) Westmoreland was present at the employment office when Hobbs applied and spoke with him about a job.  (*Id.* at 137.)  Three days later, Westmoreland hired Hobbs. (*Id.* at 138.)

Hobbs began working in the flooring department, but, within a month, was promoted to a welding position, where he was supervised by Arlice Pinkard ("Pinkard").  (*Id.* at 151-155.) According to Hobbs, Pinkard soon began to curse at him.  (*Id.* at 225.)  Then, according to Hobbs, Pinkard began to put his hands on Hobbs and pull him around. (*Id.* at 227.)  According to Hobbs, Pinkard did not touch any other employees in this manner.  (*Id.* at 233.)  Hobbs asked him to stop, but Pinkard refused.  (*Id.* at 229-30.)  According to others, Pinkard cursed generally, in front of all employees. (Westmoreland Dep., DX 13, at 140-44, 155; McGough Dep., DX 10, at 34-35; Dover Dep., DX 5, at 55.)

According to Hobbs, Pinkard also began to refer to him as "nigger."  The first time Pinkard allegedly used this term was when Hobbs did not understand whether he should clock out. (Hobbs Dep., PX 12, at 243-45.)  Pinkard allegedly called Hobbs a "damn, stupid nigger." (*Id.*)  Hobbs recounted two other instances where Pinkard used the same racial term in relation to Hobbs's work habits and performance. (*Id.* at 257-61.)  Additionally, Hobbs recounted one

3

instance where Pinkard used the term "nigger" conversationally. (*Id.* at 240 ("who's that damn nigger that was in that movie?").) Hobbs testified that Pinkard "was constantly referring to me as mother fucker, nigger, and goddamn it. They was his three favorite . . . phrases." (*Id.* at 299.)

Fellow employees Clint Tittle ("Tittle") and Bill Clark confirmed that Pinkard directed racial epithets at Hobbs. (Tittle Decl., PX 2, at ¶¶ 2-4; Clark Decl., PX 2, at ¶ 2.) Further, Tittle stated that Pinkard referred to Hobbs in such terms outside Hobbs's presence and that Tittle told Hobbs of such remarks. (Tittle Decl., PX 2, at ¶ 4.) According to Hobbs, other employees told him that Pinkard referred to him as "nigger" outside his presence. (Hobbs Decl., PX 2, at ¶ 1.)

Plant Manager Dale McGough ("McGough") confirmed that Pinkard may have used the word "nigger" in the workplace and told racist jokes. (McGough Dep., PX 15, at 30-31, 39, 42.) McGough, however, described Pinkard's use of such terms as "passing-by" speech, not directed at anyone in particular. (*Id.* at 31, 39.) McGough and Westmoreland also testified that Hobbs contemporaneously complained about Pinkard's use of such terms. (*Id.* at 34; Westmoreland Dep., PX 19, at 152-53.) Each time he complained, Westmoreland or McGough would talk to Pinkard about his use of racial epithets and curse words and the problem would temporarily cease. (Hobbs Dep., PX 12, at 227-38, 263-65, 271-76, 285-92.)

After Hobbs's last complaint, McGough offered to move Hobbs to a P-4 welder position on another line so that he would be removed from Pinkard's supervision. (*Id.* at 285-92.) According to Hobbs, McGough warned him that if any trouble started on the new line, he would know Hobbs was the reason and he would fire Hobbs. (*Id.* at 288-89.) Hobbs declined, citing the conditions McGough attached to the offer and his desire to remain with his fellow employees. (*Id.* at 294-95.)

4

According to Hobbs, Pinkard continued to curse at him constantly and Hobbs's co-workers continued to inform Hobbs that Pinkard was calling him "nigger" outside his presence. (*Id.* at 377-82, Tittle Decl., PX 2, ¶4.)[3] However, Hobbs testified that when Max Dover replaced Westmoreland in January 1996, Hobbs did not complain to Dover regarding Pinkard's behavior. (Hobbs Dep., PX 12, at 426-27.) In early June 1996, Pinkard approached Hobbs from behind and jabbed Hobbs's leg with a sharpened metal file, giving him a small cut. (*Id.* at 191-200.) Two weeks later, Hobbs resigned. (*Id.* at 423-24.) Part of his stated reasons for resigning was based on a situation that did not involve Pinkard and is not part of this lawsuit. (*Id.* at 419-20.)[4]

In plaintiffs' Second Amended Complaint, Hobbs also includes factual allegations of discrimination as to job assignments and promotions. (Second Am. Compl. at ¶¶ 19-20.) Specifically, Hobbs avers that he was removed from two Saturday work assignments because he was black and that less-qualified white employees received promotions to a P-4 welder position and a trailer drop-deck set-up position. (*Id.* at ¶¶ 20-21.)

## C.    Plaintiff James White

In 1994, plaintiff James White ("White"), an African American male, applied for employment with Fontaine. (White Dep., PX 23, at 36-37.) In September 1994, Westmoreland hired White, who began working in the flooring department. (*Id.* at 36-37, 42.) White was

---

[3]Defendants cite Hobbs's deposition, (DX 7 at 379-80, 386), for the proposition that there were no further harassing incidents between January and June of 1996. Hobbs actually testified that during this time frame Pinkard was cursing Hobbs to his face and calling him "damn smart ass nigger and stuff like that behind my back." (*Id.* at 379-81.)

[4]Apparently, Hobbs was mistakenly fired and then re-hired. Because the parties submitted deposition excerpts only, the court cannot ascertain the full story.

5

eventually promoted to a material handling position and received several raises in pay. (*Id.* at 43-44, 48-49.)

In June 1995, White applied with Westmoreland for a draftsman position in the Engineering Department. (*Id.* at 52-53.) Westmoreland recommended White to Dave Bixler ("Bixler"), Vice President of Engineering. (Westmoreland Dep., PX 19, at 179-81.) Additionally, a Fontaine employee and five outside applicants, all white, applied for the draftsman position. (Bixler Dep., DX 1, at 15, 19.) Bixler chose to hire an outside applicant, William Hill ("Hill"). (Hill Dep., PX 10, at 18.) Bixler offered White a drafter position, which White described as a clerk position with less responsibility than the draftsman position. (White Dep., PX 23, at 64-71.) Bixler testified that White could eventually move from the drafter position to a draftsman position. (Bixler Dep., DX 1, at 26-28.) White accepted the drafter position. (White Dep., PX 23, at 64-71.)

Bixler chose Hill because he had experience in computer-aided drafting and White had no such experience. (Bixler Dep., DX 1, at 23-24.) Bixler admitted, however, that Hill's experience was on a different system than the one used at Fontaine. (*Id.* at 21-23.)

When White first moved into the drafter position, he was placed on a ninety-day probationary period. (White Dep., DX 14, at 87-88.) Additionally, when White started in engineering, Bixler warned him not to have a "bad attitude." (Bixler Dep., PX 5, at 28-29.) Bixler testified that he told this to all employees. (*Id.* at 29.) Sometime thereafter, Bixler commented to another supervisor, Marcus Staehling, that he had "hired one" and therefore Staehling did not have to. (Staehling Dep., PX 18, at 11-13.) Staehling testified that he did not understand the comment to refer to African-Americans. (*Id.*)

6

Bixler testified that he didn't "recall saying anything like that." (Bixler Dep., PX 5, at 9.) Bixler went on to explain, however, that his group performed "pre-engineering" for Staehling. (*Id.* at 10.) According to Bixler, when the previous drafter left, there was an outstanding pre-engineering project and Staehling was concerned that "perhaps we wouldn't be able to supply him with the information on a timely basis." (*Id.* at 11.) Thus, Bixler concluded that "if I said anything to [Staehling], it was to assure him that I have hired someone to come in" and Staehling would not have to hire anyone. (*Id.*)

On January 16, 1996, Bixler issued a written warning to White based on White's alleged absenteeism. (White Dep., DX 14, at 90-92; Employee Disciplinary Report dated January 16, 1996, DX 15.) Prior to this warning, White's probationary period had already been extended because of unexcused absences. (White Dep., DX 14, at 92.) In the written warning, Bixler warned White that upon his next unexcused absence, he would be terminated. (Employee Disciplinary Report dated January 16, 1996, DX 15.)[5]

On April 12, 1996, Bixler issued a second written warning to White for allegedly not reporting that he had national guard duty one weekend. (White Dep., PX 23, at 139-141; Employee Disciplinary Report dated April 12, 1996, PX 24.) White contends that he told Bixler that he would miss work on Friday, April 12, 1996, due to national guard duty. (White Dep., PX 23, at 139-41.) Once again, Bixler warned White that further unexcused absences would result in termination. (Employee Disciplinary Report dated April 12, 1996, PX 24.)

---

[5]Plaintiffs, citing McGough Dep., PX 15, at 38, claim that according to McGough, this violated Fontaine's progressive discipline policy. (Pls.' Br. in Opp. at 16.) Neither the plaintiffs nor the defendant include this deposition excerpt in their evidentiary submissions. Consequently, the court cannot consider this contention.

According to company policy, in case of an absence, employees were to contact the company personnel office. (Bixler Dep., DX 1, at 32-33.) Additionally, Bixler told White that he should contact Bixler directly and then, if Bixler was not available, Ken Thompson. (*Id.* at 33-35.)

On June 12, 1996, White filed a Charge of Discrimination ("EEOC Charge") with the Equal Employment Opportunity Commission ("EEOC"). (EEOC Charge, DX 15.) In the EEOC Charge, White averred that he was discriminated against on the basis of his race in promotion (nonselection to the draftsman position), compensation, discipline, and other terms and conditions of employment. (*Id.*)

On the morning of Tuesday, June 18, 1996, White claims that he called an engineering department co-worker, Ricky Cooper, to inform the company that he would not be at work that day because he was needed at the hospital, where his mother was dying of cancer. (White Dep., PX 23, at 151-53, 162; White Decl., PX 2, at ¶1.) According to White, he could not call Bixler because Bixler was out of town on business. (White Dep., PX 23, at 151.) White testified that he made it clear to Cooper that he would also miss the next day. (*Id.* at 162.)

According to White, although his mother had been in the hospital for some time, it was not until June 17, 1996, that her condition worsened to the point that her physicians informed family members that they should stay at the hospital. (*Id.* at 147-50, 152-53; White Decl., PX 2, at ¶ 1.) According to White, he was needed at the hospital to sit shifts and provide his mother with comfort and assurance. (White Decl., PX 2, at ¶ 1.) White's brothers, Ricky and Will, worked at Fontaine on Wednesday, June 19, 1999. (White Dep., PX 23, at 172-73.) White's mother died on June 25, 1996. (White Decl., PX 2, at ¶ 1.)

8

White returned to work on Thursday, June 20, 1996. (White Dep., PX 23, at 165-66.) Later that day, Bixler called White into his office to ask his reason for being absent. (*Id.* at 167.) White explained his mother's condition and also told Bixler that he had told Cooper on Tuesday that he may not come to work on Wednesday. (*Id.* at 167-68.)

Bixler then went to Fontaine's manager of Human Resources, Max Dover, to discuss the need for a more dependable employee in the drafter position. (Bixler Dep., DX 1, at 47-48.) Dover recommended that White be terminated for absenteeism and drafted a disciplinary action report that said as much. (*Id.* at 56-57; Dover Dep., DX 5, at 72-76.) An hour later, Bixler, with Dover as a witness, fired White, handing him the disciplinary report, which stated the discharge was based on "[f]ailure to notify of absence after warnings." (Employee Disciplinary Action Report dated June 20, 1996, DX 15; White Dep., PX 23 at 169-71.) White admitted that "I should have called that Wednesday, but emotionally I wasn't even thinking about it." (White Dep., PX 23, at 171.)

Bixler testified at his deposition that he terminated White for "not doing his job." (Bixler Dep., DX 1, at 40.) He also testified that he never told White that his termination was based on his failure to call in on June 19, 1996. (*Id.* at 41.) Bixler recalled disciplining White for poor job performance, although there is no documentary evidence of such discipline. (*Id.* at 40-45.) White denies ever talking to Bixler regarding poor job performance. (White Decl., PX 2, at ¶ 2.) Max Dover, Human Resources Manager at Fontaine, testified that Bixler's and White's relationship was best characterized by a "lack of communication." (Dover Dep., PX 8, at 37-39.)

On July 30, 1996, more than a month after White's termination, Fontaine received notice of White's EEOC Charge. (Dover Aff., DX 17, at ¶ 4.)

9

Plaintiffs' Second Amended Complaint also contains allegations that White was discriminated against because of his race in compensation (regular pay and Christmas bonus), length of probationary period, and other terms and conditions of employment. (Second Am. Compl. ¶¶ 31-33.) White further alleges that he was discharged in retaliation for filing his EEOC Charge. (*Id.* at ¶ 32.)

## D.   Applicants

### 1.   *Valerie Hobbs Brown*

On December 12, 1994, and on July 18, 1995, Valerie Hobbs Brown ("Brown") applied for employment with Fontaine under her maiden name of Hobbs. (Emp. Applications of Valerie Hobbs Brown, PX 7.) Westmoreland did not hire Brown because he mistook her application for that of another African American female, Debra Hobbs. (Westmoreland Dep., PX 19, at 37-38, 40.) Westmoreland had hired Debra Hobbs when he worked at another company and she had walked off the job without explanation.[6] (*Id.*) Brown, however, had not written that company's name on her employment application. (Emp. Applications of Valerie Hobbs Brown, PX 7; Westmoreland Dep., PX 19, at 41-44.) Westmoreland did not call Brown to confirm her identity. (Westmoreland Dep., PX 19, at 40-41.)

### 2.   *Willie Hobbs*

Since 1974, Willie Hobbs ("W. Hobbs"), an African American male, has applied for employment at Fontaine several times. (W. Hobbs Dep., PX 14, at 15-20, 66-69, 73.) McGough, who knew W. Hobbs from his National Guard unit, recommended to Westmoreland

---

[6]The company is called Kaiser Roth in one place, (Westmoreland Dep., PX 19, at 37), and Haleyville Textiles at another, (*Id.* at 42).

that W. Hobbs not be hired because he was not a good and dependable soldier. (McGough Dep.,

PX 15, at 19.) W. Hobbs testified that he had a spotless record with the National Guard and

received an Honorable Discharge. (W. Hobbs Dep., PX 14, at 26-28; W. Hobbs Decl., PX 2.)

### 3.   *Timmy Brown*

Timmy Brown ("T. Brown"), an African American male, applied to Fontaine on several

occasions, including December 12, 1994. (Emp. Application of Timmy Brown, Supp. DX 2.)

Westmoreland and McGough claim they did not know T. Brown or his race. (Westmoreland

Dep., DX 13, at 105; McGough Dep., DX 10, at 18.) In his deposition, T. Brown testified that

after he applied, he was not called for an interview at Fontaine, but later visited the defendant and

interviewed with McGough. (T. Brown Dep., Supp. DX 3, at 47, 55-61.) Then, in his

declaration, T. Brown stated that he has learned that the man he believed to be McGough was

actually Westmoreland. (T. Brown Decl., PX 2, at ¶ 1.) T. Brown testified that after the

interview, he never received a phone call. (T. Brown. Dep., Supp. DX 3, at 55-61.)

### 4.   *Henry Hamilton, Willie J. Abernathy, Willie L. Abernathy and Chris Willingham*

Henry Hamilton ("Hamilton"), Willie J. Abernathy (W.J. Abernathy"), Willie L.

Abernathy ("W.L. Abernathy") and Chris Willingham ("C. Willingham"), all African-American

males, applied for positions with Fontaine but were not hired. (C. Willingham Dep., PX 25, at

21-22, 35-38; Hamilton Dep., PX 9, at 29; W.L. Abernathy Dep., PX 4, at 37-42; W.J. Abernathy

Dep., PX 3,[7] at 37-42.) These applicants were not interviewed and their applications do not

_____

[7]In the index to plaintiffs' evidentiary submission, PX 3 is labeled as "Deposition
Excerpts of William James Willingham," a person who, if real, is neither a party nor a witness to
this case. Moreover, there is no deposition cover page included as part of PX 3 that would

11

indicate their race. (Pls.' Opp. at 25.) However, these four plaintiffs state that in their applications, they listed only the names of African-American employees as their referral source. (Hamilton Decl.; C. Willingham Decl.; W.J. Abernathy Decl.; W.L. Abernathy Decl., PX 2) The applications of these four plaintiffs are not included in the evidentiary submissions.

## 5. *Lynn Willingham*

In September 1995, Lynn Willingham ("L. Willingham"), an African-American female, applied for a position at Fontaine but was not hired. (Emp. Application of L. Willingham, DX 21.) Westmoreland admits that he knew L. Willingham's race because she listed the names of her brothers and her brother-in-law on the application and identified them as relatives. (Westmoreland Dep., DX 19, at 114; Employment Application of L. Willingham, DX 21.) Westmoreland could not recall why he did not hire her, but, upon reviewing her application at the deposition, testified that it may have been because she disputed her last termination and "had missed evidently quite a bit of time." (*Id.* at 113.)

## III. ANALYSIS

### A. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper if the pleadings and evidence indicate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.

---

identify the deponent's identity. It is clear, however, from the testimony included in PX 3 that the deponent is actually W. J. Abernathy, and that PX 3 consists of excerpts from his deposition.

12

1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgement, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

**B.    Applicants' Claims**

    *1.    Henry Hamilton, Willie J. Abernathy, Willie L. Abernathy, and Chris Willingham*

These four applicants claim that Fontaine did not hire them because of their race. Claims of discrimination under Title VII and 42 U.S.C. § 1981 are governed by the familiar, tripartite framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981).[8] Under this framework, plaintiff bears the initial burden of establishing a prima facie

--------------------------------------------------

[8]Although the statutory language and remedies of 42 U.S.C. § 1981 are distinct from Title VII, the allocation of the burdens of proof and the analysis for determining whether a defendant employer unlawfully discriminated against an employee are the same. *Turnes v. AmSouth Bank,*

case of discrimination. *Burdine*, 450 U.S. at 252-53. If plaintiff successfully establishes a prima facie case, the burden of production shifts to the defendant "to articulate a legitimate, nondiscriminatory reason" for the employment action. *McDonnell Douglas*, 411 U.S. at 802.

If the defendant succeeds in carrying this burden, then plaintiff must prove that the defendant's articulated reasons are a mere pretext for unlawful motives (*i.e.*, race discrimination or retaliation). *Burdine*, 450 U.S. at 253. A plaintiff's prima facie case coupled with sufficient evidence to allow a fact finder to disbelieve the employer's proffered explanation for its actions is enough to preclude entry of judgment as a matter of law. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997); *Benson v. Tocco, Inc.*, 113 F.3d 1203, 1207 (11th Cir. 1997). At all times, plaintiff bears the burden of persuasion on the ultimate question of whether the defendant acted with an unlawful motive. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1). In order to establish a prima facie case of discrimination for failure to hire, plaintiff must prove (1) that plaintiff is a member of a protected class; (2) that plaintiff applied and was qualified for the position at issue; (3) that, despite his or her qualifications, the plaintiff was rejected for the position; and (4) that after this rejection the position remained open or was filled by a person not

---

*N.A.*, 36 F.3d 1057, 1060 (11th Cir. 1994).

within the protected class.[9] *Coutu v. Martin County Bd. of County Comm'n*, 47 F.3d 1068, 1073 (11th Cir. 1995); *Welborn v. Reynolds Metals Co.*, 810 F.2d 1026, 1028 (11th Cir. 1987).

In this case, the defendant claims that the decision-maker, Westmoreland, never knew the race of these four applicants, precluding them from establishing a case of intentional discrimination based on race. (Def.'s Brief at 22-23.) The defendant offers sworn testimony that Westmoreland did not know the race of these four applicants. (Westmoreland Dep., DX 13, at 124-26, 129-30, 132-34, 189.) Plaintiffs concede that these four applicants were not interviewed and their applications do not directly indicate their race. (Pls.' Opp. at 25.) However, the four plaintiffs state that in their applications, they listed only the names of African-American employees as their referral source. (Hamilton Decl.; C. Willingham Decl.; W.J. Abernathy Decl.; W.L. Abernathy Decl., PX 2.) Thus, they contend that Westmoreland could have deduced their race and a genuine issue of material fact exists as to whether Westmoreland had done so.

In *Robinson v. Adams*, 847 F. 2d 1315, 1316-17 (9th Cir. 1987), the Ninth Circuit was faced with an almost identical set of facts. The plaintiff had filled out screening applications for four positions with Orange County, California, on which he had checked a box indicating his race. *Id.* at 1316. The box was located on a detachable flap, but plaintiff argued that if the flap was not removed, as was apparently the case in some applications, the decision-makers could have discovered his race. *Id.* The defendant submitted affidavits from the application screeners declaring that they were unaware of the plaintiff's race when he applied. *Id.* at 1317. Consequently the court held that "no genuine issue exists as to whether the application screeners

---

[9]The legal elements of a §1981 and Title VII claim are identical. *See Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985).

were aware of [plaintiff's] race." *Id.* Consequently, "summary judgment was appropriate on Robinson's intentional discrimination theory." *Id.*[10]

Similarly, in this case, these four plaintiffs try to create a genuine issue of material fact by arguing that Westmoreland could have deduced their race from the names of the African American employees they wrote down as referral sources. The court rejects this argument. As in *Robinson*, the evidence presented by plaintiffs is "merely colorable, and is not significantly probative." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986)). Consequently, this court is unable to find that a genuine issue of fact exists as to whether Westmoreland knew the race of plaintiffs Hamilton, W.J. Abernathy, W.L. Abernathy and C. Willingham, and instead is of the opinion that summary judgment is due to be granted on all claims pertaining to Fontaine's failure to hire these four plaintiffs.

### 2.   *Timmy Brown and Lynn Willingham*

Timmy Brown ("T. Brown") and Lynn Willingham ("L. Willingham") likewise contend that Fontaine failed to hire them because of their race. T. Brown applied to Fontaine on several occasions, including December 12, 1994. (Emp. Application of T. Brown, Supp. DX 2.) In his deposition, T. Brown testified that after he applied, he was not called for an interview at Fontaine, but later visited the defendant and  interviewed with McGough. (T. Brown Dep., Supp. DX 3, at 47, 55-61.) Then, in his declaration, T. Brown stated that he has learned that the man he believed to be McGough was actually Westmoreland. (T. Brown Decl., PX 2, at ¶ 1.) T. Brown

---

[10]  The Ninth Circuit recognized that plaintiff could technically satisfy all four elements of the prima facie case, but reasoned that the *McDonnell Douglas* elements would not rationally create an inference of discrimination "if, as here, a plaintiff offers proof that he is black, but there is no showing by direct or indirect evidence that the decision-maker knew this fact." *Id.* at 1316.

testified that after the interview, he never received a phone call. (T. Brown. Dep., Supp. DX 3, at 55-61.)

As with the four applicants discussed above, Westmoreland and McGough claim they did not know T. Brown or his race. (Westmoreland Dep., DX 13, at 105; McGough Dep., DX 10, at 18.) Unlike the above four applicants, however, T. Brown offers sworn testimony that he interviewed with Westmoreland at Fontaine, therefore creating a question of fact regarding Westmoreland's knowledge of T. Brown's race.[11]

In September 1995, L. Willingham, applied for a position at Fontaine but was not hired. (Emp. Application of L. Willingham, PX 21.)   Westmoreland admits that he knew L. Willingham's race because she listed the names of her brothers and her brother-in-law (Fontaine employees) on the application and identified them as relatives. (Westmoreland Dep., PX 19, at 114; Employment Application of L. Willingham, PX 21.)

Although Westmoreland may have known the race of both these plaintiffs, they must still satisfy all elements of their prima facie case of discrimination in hiring: (1) that they are members of a protected class; (2) that they applied and were qualified for the position(s) at issue; (3) that, despite their qualifications, they were rejected for the position(s); and (4) that after this rejection the position(s) remained open or was filled by a person(s) not within the protected class. *Coutu*, 47 F.3d at 1073; *Welborn*, 810 F.2d at 1028. In order to satisfy the fourth element, a

_____

[11]The defendant points out the inconsistency between T. Brown's deposition (identifying McGough as the interviewer) and declaration (switching to Westmoreland). The court, however, is of the opinion that such inconsistency is a credibility question left to the province of the trier of fact. The defendant also argues that earlier in the deposition, T. Brown stated that he did not interview with Fontaine. (Def.'s Reply at 2, citing T. Brown Dep., Supp. DX 3, at 47.) The cited deposition page does not support defendant's argument.

17

plaintiff "need not identify the successful applicant for a position." *Walker v. Mortham*, 158 F. 3d 1177, 1193 (11th Cir. 1998). Instead, a plaintiff "is only required to establish that the successful applicant is not within her protected class." *Id.*

In this case, these two plaintiffs fail to establish that the positions remained open or were filled by people not within the protected class. They set forth no evidence of the status of the positions for which they applied. Further, they set forth no evidence of the race of any alleged successful applicants for the positions they sought. They do not present applications, personnel records, employee rosters, applicant data, newspaper advertisements, or hiring data showing that Fontaine continued to seek applicants or that white employees successfully applied for the positions that they applied for. The record contains some general testimony as to white applicants who were hired at the plant. (Brown Dep., DX 3, at 33-34; Westmoreland Dep., DX 13, at 120-28.) However, there is no evidence that any of these alleged applicants were applying for the same positions as these two plaintiffs during or after the same time period they applied.

The court is of the opinion that such general testimony is not sufficient evidence on which a reasonable jury could conclude that someone outside T. Brown and L. Willingham's protected class successfully applied for the positions they sought. Consequently, the court is of the opinion that neither plaintiff has established a prima facie case of discrimination, and summary judgment is due to be granted on all claims relating to Fontaine's failure to hire T. Brown and L. Willingham.[12]

---

[12] Defendants also argue that Fontaine had a legitimate, nondiscriminatory reason for not hiring L. Willingham. Westmoreland testified that he may have rejected her application because she disputed her last termination and "had missed evidently quite a bit of time." (*Id.* at 113.) Although Westmoreland's testimony may constitute a legitimate, nondiscriminatory reason for

### 3.   *Valerie Hobbs Brown*

Brown also claims that Fontaine failed to hire her based on her race.  On December 12,

1994, and on July 18, 1995, Brown applied for employment with Fontaine.  (Emp. Applications

of Valerie Hobbs Brown, PX 7.)  Westmoreland testified that he did not hire Brown because he

mistook her application for that of Debra Hobbs, an African American female he had hired at

another company who has subsequently walked off the job without notice.  (Westmoreland Dep.,

PX 19, at 37-38, 40.)  Defendant argues that this case of mistaken identity constitutes a

legitimate, nondiscriminatory reason for not hiring Brown.  The court agrees.

In response, Brown correctly notes that she did not write that company's name on her

employment application.  (Emp. Applications of Valerie Hobbs Brown, PX 7; Westmoreland

Dep., PX 19, at 41-44.)  Further, Brown points out that Westmoreland did not call Brown to

confirm her identity.  (Westmoreland Dep., PX 19, at 40-41.)[13]  Thus, Brown argues that

Westmoreland's alleged case of mistaken identity is merely pretext for unlawful discrimination

based on race.

The court, however, is of the opinion that Brown has failed to set forth sufficient

evidence for a reasonable jury to conclude that Fontaine's legitimate, nondiscriminatory reason

---

failing to hire L. Willingham, it must be viewed in the context of his testimony that he has no
independent recollection of screening her application.  (*Id.* at 113, 115.)  Because L. Willingham
failed to establish a prima facie case, the court need not consider whether Westmoreland's
testimony could be considered a legitimate nondiscriminatory reason for not hiring L.
Willingham.

[13]  Westmoreland offered other reasons why Brown was not qualified for the job,
(Westmoreland Dep. at 55-59), but given his testimony that he did not hire her because he
mistook her identity, the court need not address the issue of Brown's qualifications.

was pretext for unlawful discrimination based on race.  Consequently, the court is of the opinion that summary judgment is due to be granted on all claims relating to Fontaine's failure to hire Brown.

### 4.    *Willie Hobbs*

Willie Hobbs ("W. Hobbs") also contends that Fontaine's failure to hire him constitutes unlawful discrimination based on his race.  Since 1974, W. Hobbs has applied for employment at Fontaine several times.  (W. Hobbs Dep., PX 14, at 15-20, 66-69, 73.)  McGough, who knew W. Hobbs from his National Guard unit, recommended to Westmoreland that W. Hobbs not be hired because he was not a good and dependable soldier.  (McGough Dep., PX 15, at 19.)

Defendant argues that McGough's recommendation constitutes a legitimate, nondiscriminatory reason for Fontaine's failure to hire W. Hobbs.  In response, W. Hobbs contends that he had a spotless record with the National Guard and received an Honorable Discharge.  (W. Hobbs Dep., PX 14, at 26-28; W. Hobbs Decl., PX 2.)  Thus, W. Hobbs contends that Fontaine's proffered reason is merely pretext for unlawful discrimination based on race.

The court, however, is of the opinion that W. Hobbs has failed to set forth sufficient evidence for a reasonable jury to conclude that Fontaine's legitimate, nondiscriminatory reason was pretext for unlawful discrimination based on race.  Consequently, the court is of the opinion that summary judgment is due to be granted on all claims relating to Fontaine's failure to hire W. Hobbs.

20

### C.    White's Claims

#### *1.    Discrimination in Compensation and Christmas Bonus*

White claims that Fontaine discriminated against him on the basis of his race by compensating him less than similarly situated white employees in both regular pay and Christmas bonuses. (Second Am. Compl. ¶ 31.)  To establish a prima facie case of disparate treatment based on conditions of employment under Title VII, White must show that: (1) he belongs to a protected class; and (2) he was similarly situated to a person who was not a member of the protected class; but (3) did not receive a condition of employment provided to that person. *Mitchell v. Carrier Corp.*, 954 F. Supp. 1568, (M.D. Ga. 1995) (citing *Thompkins v. Morris Brown College*, 752 F. 2d 558, 562 n.7 (11th Cir. 1985)).

Defendant contends that there is no evidence that White was treated differently than any other employee as to compensation or Christmas bonus, and therefore White cannot satisfy the second element of his prima facie case. (Def.'s Brief at 34.)  In response, the plaintiff offers no evidence that White was treated differently than similarly situated employees with respect to regular pay or Christmas bonus.  Indeed, White does not address the claim at all in his Opposition to defendant's Motion for Summary Judgment.  Consequently, the court is of the opinion that White has failed to establish a prima facie case of discrimination in compensation and summary judgment is due to be granted on all claims relating to White's regular pay or Christmas bonus.

#### *2.    Discrimination by Extended Probationary Period*

White contends that Fontaine discriminated against him by extending his probationary period in the Engineering Department. (Second Am. Compl. ¶ 31.)  Defendant again argues that

21

White cannot establish a prima facie case because he cannot show he was treated differently than a similarly situated employee outside his protected class. (Def.'s Brief at 32.) In response, the plaintiff offers no evidence that White was treated differently than similarly situated employees with respect to probationary periods. Indeed, White does not address the claim at all in his Opposition to defendant's Motion for Summary Judgment. Consequently, the court is of the opinion that White has failed to establish a prima facie case of discrimination and summary judgment is due to be granted on all claims relating to White's probationary period.

### 3.    *Discrimination in Promotion*

White also claims that Fontaine discriminated against him because of his race by promoting William Hill to the draftsman position. In September 1994, Westmoreland hired White, who began working in the flooring department and eventually moved to a material handling position. (White Dep., PX 23, at 36-37, 42-44, 48-49.)

In June 1995, White applied with Westmoreland for a draftsman position in the Engineering Department. (*Id.* at 52-53.) Westmoreland recommended White to Dave Bixler, Vice President of Engineering. (Westmoreland Dep., PX 19, at 179-81.) Additionally, a Fontaine employee and five outside applicants, all white, applied for the draftsman position. (Bixler Dep., DX 1, at 15, 19.) Bixler chose to hire an outside applicant, William Hill. (Hill Dep., PX 10, at 18.) Bixler offered White a drafter position, which White accepted. (White Dep., PX 23, at 64-71.)

To establish a prima facie case of discriminatory failure to promote, White must show that (1) he was in a protected group; (2) he was not given the promotion; (3) he was qualified for the position and (4) someone outside of the protected group was given the position. *Coutu v.*

22

*Martin County Bd. of County Commissioners*, 47 F. 3d 1068, 1073 (11th Cir. 1995). Here, it is clear that White has set forth sufficient evidence to satisfy the elements of his prima facie case.

Turning to the next step in the familiar *McDonnell Douglas* burden-shifting framework, Fontaine has articulated a legitimate, nondiscriminatory reason for promoting Hill instead of White: Hill had experience in computer-aided drafting and White had no such experience. (Bixler Dep., DX 1,  at 23-24.)

As evidence of pretext, White argues that (1) Hill's experience was on a different system than the one used at Fontaine,  (*Id.* at 21-23); (2) when he started in engineering, Bixler warned him not to have a "bad attitude," (Bixler Dep., PX 5, at 28-29); and (3) Bixler commented to another supervisor, Marcus Staehling, that he (Bixler) had "hired one" and therefore Staehling did not have to hire anyone.  (Staehling Dep., PX 18, at 11-13.)

In response Fontaine points out that (1) Hill had a proven track record in computer-aided drafting, even if it was on another system, (Bixler Dep., DX 1, at 23-24); (2) Bixler talked to all employees, regardless of race, about their attitudes, (Bixler Dep., DX 1, at 21); and (3) Staehling testified that he did not understand Bixler's comment to refer to African-Americans. (Staehling Dep, PX 18, at 11-13.)  Further, on the last point , Fontaine proffers Bixler's explanation that "if I said anything to [Staehling], it was to assure him that I have hired someone to come in" to perform pre-engineering, and Staehling would not have to hire anyone.  (Bixler Dep., DX 1, at 23-24.)

Given Bixler's and Staehling's testimony, the court is of the opinion that plaintiff has failed to set forth sufficient evidence from a which a reasonable jury could find that the reason articulated by the defendant for its failure to promote White was pretext for unlawful

discrimination based on race. Consequently, the court is of the opinion that summary judgment is due to be granted on all claims relating to Fontaine's failure to promote White to the position of draftsman.

### 4.   *Discrimination in Discharge*

White contends that Fontaine discriminated against him based on his race by discharging him. Defendant assumes, *arguendo*, that White meets all the elements of a prima facie case of discrimination in discharge. (Def.'s brief at 34.) Defendant moves for summary judgment, based on the articulated, legitimate, nondiscriminatory reason that White was fired due to absences. (*Id.*) Upon review of the evidentiary record set forth in detail above, the court is of the opinion that Fontaine has met its burden of articulating a legitimate, nondiscriminatory reason for discharging White.

As evidence of pretext, White contends that Bixler contradicted the proffered reason. Bixler testified at his deposition that he terminated White for "not doing his job." (Bixler Dep., DX 1, at 40.) He also asserted that he never told White that his termination was based on his failure to call in on June 19, 1996. (*Id.* at 41.) Bixler recalled disciplining White for poor job performance, although there is no evidence of such discipline. (*Id.* at 40-45.) White denies ever talking to Bixler regarding poor job performance. (White Decl., PX 2, at ¶ 2.)[14]

In response, Fontaine contends that Bixler's testimony regarding White's poor job performance was perfectly consistent with the proffered reason of absenteeism. (Def.'s Reply at

---

[14]Plaintiff also contends that Dover testified that White was terminated for lack of communication. (Pl.'s Opp. at 42.) Upon review of the cited deposition testimony, the court does not agree. Dover's testimony was that the real problem between Bixler and White was a "lack of communication." (Dover Dep., PX 8, at 37-39.)

24

13-14.) The court agrees.  Bixler testified that he told White that he "was not doing the job" and that "it took him too long to get drawings in the computer."  (Bixler Dep., DX 1, at 41-42.) Further, when confronted with White's last absence, Bixler talked to Dover regarding White's lack of dependability.  (Bixler Dep., DX 1, at 47-48.)  It was Max Dover's decision to couch the termination in terms of absenteeism.  (*Id.* at 56-57; Dover Dep., DX 5, at 72-76.)  Further, White admitted that "I should have called that Wednesday, but emotionally I wasn't even thinking about it."  (White Dep., PX 23, at 171.)

Based upon Bixler and Dover's testimony, and White's admission that he should have called in, the court is of the opinion that White has not set forth sufficient evidence from which a reasonable jury could find that the reason articulated by the defendant for White's discharge was pretext for unlawful discrimination based on race.  Consequently, the court is of the opinion that summary judgment is due to be granted on all claims of discrimination relating to Fontaine's discharge of White.

### 5. *Retaliation by Discharge*

White claims that Fontaine unlawfully retaliated against him because he filed an EEOC Charge.  To establish a prima facie case of retaliation plaintiff must show: (1) that he engaged in statutorily protected expression, (2) that he experienced an adverse employment action, and (3) a causal link between the protected expression and the adverse action.  *Goldsmith v. City of Atmore*, 996 F. 2d 1155, 1163 (11th Cir. 1993).

Defendant contends that White is precluded form establishing a prima facie case of retaliation because there is no causal link between the protected conduct (filing the EEOC

25

Charge) and the adverse action.  The court agrees.[15]  White filed his EEOC Charge on June 12,

1996.  (EEOC Charge, DX 15.)  Dover and Bixler terminated White on June 20, 1996.

(Employee Disciplinary Action Report dated June 20, 1996, DX 15; White Dep., PX 23 at 169-

71.)  On July 30, 1996, more than a month after White's termination, Fontaine received notice of

White's EEOC Charge.  (Dover Aff., DX 17, at ¶ 4.)  Based on this evidence, the court is of the

opinion that White has failed to establish a prima facie case of retaliation, and summary

judgment is due to be granted on all claims of retaliation relating to White's discharge.  In the

alternative, even assuming that White had established a prima facie case, he has not put forth

sufficient evidence on which a reasonable jury could conclude that Fontaine's articulated reason

for terminating him, absenteeism, was pretext for illegal retaliation.

### 6.     *Family and Medical Leave Act ("FMLA") Claim*

Finally, White contends that Fontaine violated the FMLA by discharging him for

absenteeism after he requested time off to care for his sick mother.  (Second Am. Compl. at ¶¶

41-42.)  Defendant moves for summary judgment based two contentions: (1) White failed to

provide adequate notice as required by the FMLA; and (2) White was not needed to care for his

mother.  (Def.'s Brief at 42.)  The court is of the opinion that the lack of adequate notice is

dispositive of this claim.

The FMLA "entitle[s] employees to take reasonable leave for medical reasons, for the

birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health

condition."  29 U.S.C. § 2601(b)(2).  If the need for leave is unforeseeable,

---

[15]Once again, White does not discuss this claim in his Opposition to defendant's Motion
for Summary Judgment.

> an employee should give notice to the employer of the need for
> FMLA leave as soon as practicable under the facts and
> circumstances of the particular case. It is expected that an
> employee will give notice to the employer within no more than one
> or two working days of learning of the need for leave, except in
> extraordinary circumstances where such notice is not feasible.

29 C.F.R. § 825.303(a).

Assuming, *arguendo*, that White's need for leave was unforeseeable, his phone call to a

co-worker concerning his June 18, 1996, absence did not provide adequate notice to Fontaine

that White was taking leave under the FMLA on June 19, 1996. According to company policy,

in case of an absence, employees were to contact the company personnel office. (Bixler Dep.,

DX 1, at 32-33.) Additionally, Bixler told White that in case of an absence, he should contact

Bixler directly and then, if Bixler was not available, Ken Thompson. (*Id.* at 33-35.) Not only

did White fail to contact the correct personnel (either the personnel department, Bixler, or Ken

Thompson), he also failed to have his brothers notify any of the proper personnel when they

returned to work on June 19, 1996.[16] (White Dep., PX 23, at 172-73.) Finally, White himself

admits that he should have called in on that Wednesday, June 19. (White Dep., PX 23, at 171.)

The court also notes that White never specifically requested FMLA leave. The court is of

the opinion that White cannot retroactively designate his absences as FMLA leave in order to

bring this claim. The FMLA "should not be interpreted to give every terminated employee the

right to retroactively claim that his or her sick leave should be considered FMLA leave, thereby

---

[16]There are no claims in this case or evidence in the record that White's brothers were
fired or otherwise disciplined for being absent when their mother was ill.

27

supporting a claim pursuant to the Act's non-discrimination provisions." *Walthall v. Fulton County School District*, 18 F. Supp. 2d 1378, 1384 (N.D. Ga. 1998).

Consequently, the court is of the opinion that White has not set forth sufficient evidence on which a reasonable jury could find that he gave adequate notice to Fontaine as soon as practicable, or that such notice was for FMLA leave. Therefore, the court is of the opinion that summary judgment is due to be granted on White's FMLA claims.[17]

## D.   Hobbs's Claims

### 1.   *Discrimination in Work Assignments*

Hobbs contends Fontaine discriminated against him based on his race by removing him from additional work assignments on Saturdays. (Second Am. Compl. ¶ 19.) Defendant offers the affidavit of Max Hutcheson, Maintenance Supervisor, who stated that Hobbs had performed Saturday work, but when Hutcheson asked Hobbs about performing more Saturday work, Hobbs declined. (Hutcheson Aff., DX 18, at ¶¶ 2-3.) Therefore, defendant claims that summary judgment is due to be granted.

---

[17]Even if the court were to find that notice was adequate, the court is of the opinion that White cannot state a claim under the FMLA. The evidence shows that White received a warning on January 16, 1996, regarding excessive unexcused absences that specifically stated that further unexcused absences could lead to discharge. Despite this warning, and despite White's knowledge that he should notify Bixler in case of further absences, White failed to call Fontaine on June 19, 1996, to explain his absence. Consequently, even assuming White had requested FMLA leave, no reasonable jury could find that he was fired for this reason. *See Bailey v. Amsted Industries Inc.*, 172 F. 3d 1041, 1045-46 (8th Cir. 1999) (holding that the employer did not violate FMLA by discharging an employee for excessive absenteeism, where the vast majority of his absences were not for medical reasons).

In response, Hobbs offers no evidence that (1) he was treated differently than similarly situated employees with respect to Saturday work assignments;[18] or (2) that Hutcheson's stated reason for removing Hobbs from Saturday work was pretext for unlawful discrimination. Indeed, Hobbs does not address the claim at all in his Opposition to defendant's Motion for Summary Judgment.  Consequently, the court is of the opinion that Hobbs has failed to establish a prima facie case of discrimination in work assignments and has failed to rebut Fontaine's proffered reason for removing Hobbs from Saturday work.  Therefore, summary judgment is due to be granted on all claims relating to Fontaine's removal of Hobbs from Saturday work.

### 2.    *Discrimination in Promotion*

Hobbs also contends that Fontaine discriminated against him based on his race by failing to promote him to a P-4 welder position. (Second Am. Compl. at ¶ 20.) Defendant contends that because Hobbs did not apply for such positions, he cannot establish a prima facie case.  To establish a prima facie case of discriminatory failure to promote, Hobbs must show that (1) he was in a protected group; (2) he was not given the promotion; (3) he was qualified for the position; and (4) someone outside of the protected group was given the position.  *Coutu v. Martin County Bd. of County Commissioners*, 47 F.3d 1068, 1073 (11th Cir.1995).

As White's testimony establishes, current Fontaine employees apply for openings at the plant by signing the job posting list. (White Dep., DX 14, at 47-48.)  Defendant argues that P-4

---

[18]As noted, to establish a prima facie case of disparate treatment based on conditions of employment under Title VII, Hobbs must show that: (1) he belongs to a protected class; and (2) he was similarly situated to a person who was not a member of the protected class; but (3) did not receive a condition of employment provided to that person.  *Mitchell v. Carrier Corp.*, 954 F. Supp. 1568, (M.D. Ga. 1995) (citing *Thompkins v. Morris Brown College*, 752 F. 2d 558, 562 n.7 (11th Cir. 1985)).

29

welder positions were available on numerous occasions, but Hobbs never signed the list to be considered for such positions. (Hobbs Dep., DX 7, at 203; Westmoreland Dep., DX 13, at 167.) In response, Hobbs offers no evidence that he applied for such positions. Indeed, Hobbs does not address the claim at all in his Opposition to defendant's Motion for Summary Judgment. Consequently, the court is of the opinion that Hobbs has failed to establish a prima facie case of discrimination in promotion and summary judgment is due to be granted on all claims relating to Fontaine's failure to promote Hobbs.

### 3. *Racial Harassment*

Hobbs claims that through the words and actions of his supervisor, Arlice Pinkard, he was subject to unlawful discrimination in the form of harassment based on race. In moving for summary judgment, defendant contends that the complained of conduct was not sufficiently severe and pervasive to alter the terms and conditions of Hobbs's employment.

Title VII of the Civil Rights Act of 1964, as amended, prohibits employer discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's . . . race." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court set forth the analytical framework to be followed in cases involving discrimination based on harassment by a supervisor in the companion cases of *Faragher v. City of Boca Raton,* 524 U.S. 775 (1998) and *Burlington Industries v. Ellerth,* 524 U.S. 742 (1998). However, the threshold question is whether discrimination has, indeed, occurred. *See Burlington Industries,*

524 U.S. at 754 ("For any sexual harassment preceding the employment decision to be actionable, however, the conduct must be severe and pervasive.")[19]

To establish a prima facie case of hostile working environment, a plaintiff must show: (1) that the employee belongs to a protected group; (2) that the employee was subject to unwelcome harassment; (3) that the harassment complained of was based on the employee's protected class, in this case race; and (4) that the harassment affected a term, condition, or privilege of the complainant's employment in that it was severe or pervasive enough to alter the conditions of the plaintiff's employment and create an abusive working environment. *Henson v. City of Dundee,* 682 F.2d 897, 903-04 (11th Cir. 1982)

Plaintiff has satisfied the first three elements of the prima facie case. Plaintiff is an African American male who was subject to unwelcome harassment based upon his race. The key issue in this case is whether the harassment was severe or pervasive enough to alter the conditions of his employment and create an abusive environment.

Although Title VII's prohibition of discrimination clearly includes harassment, "Title VII is not a federal 'civility code.'" *Mendoza v. Borden, Inc.*, 195 F. 3d 1238, 1245 (11th Cir. 1999) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 76-81 (1998)). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in terms and conditions of employment." *Faragher,* 524 U.S. at 788 (internal citations quotations omitted).

---

[19]Although *Faragher* and *Burlington Industries* involved sexual harassment, the analytical framework applies to racial harassment cases, as well. *See Faragher*, 524 U.S. at 787 n.1; *Allen v. Dep't of Corrections*, 165 F. 3d 405, 411-12 (6th Cir. 1999) (collecting cases).

31

Establishing that harassing conduct was severe or pervasive enough to alter the conditions of employment contains an objective and a subjective component. *Mendoza*, 195 F. 3d at 1246 (citing *Harris*, 520 U.S. at 21-22). The employee must subjectively perceive the harassment to be so severe or pervasive as to alter the conditions of employment, "and this subjective perception must be objectively reasonable." *Id.* "Furthermore, 'the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'" *Id.* (quoting *Oncale*, 523 U.S. at 81).

In analyzing the objective component, the court must consider four factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct interferes with the employee's job performance. *Id.* "The courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe and pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile working environment." *Id.*

In this case, soon after Hobbs began to work at Fontaine his supervisor, Arlice Pinkard, began to curse at him. (Hobbs Dep., PX 12, at 225.)[20] Then, Pinkard began to put his hands on Hobbs and pull him around. (*Id.* at 227.) According to Hobbs, Pinkard did not touch any other employees in this manner. (*Id.* at 233.) Hobbs asked him to stop, but Pinkard refused. (*Id.* at 229-30.) According to others, Pinkard cursed generally, in front of all employees.

---

[20]As required at the summary judgment stage all reasonable inferences are drawn in favor of the plaintiff.

(Westmoreland Dep., DX 13, at 140-44, 155; McGough Dep., DX 10, at 34-35; Dover Dep., DX 5, at 55.)

According to Hobbs, Pinkard also began to refer to him as "nigger." The first time Pinkard allegedly used this term was when Hobbs did not understand whether he should clock out. (Hobbs Dep., PX 12, at 243-45.) Pinkard allegedly called Hobbs a "damn, stupid nigger." (*Id.*) Hobbs recounted two other instances where Pinkard used the same racial term in relation to Hobbs's work habits and performance. (*Id.* at 257-61.)

Additionally, Hobbs recounted one instance where Pinkard used the term "nigger" conversationally. (*Id.* at 240 ("who's that damn nigger that was in that movie?").) Finally, Hobbs testified that Pinkard "was constantly referring to me as mother fucker, nigger, and goddamn it. They was his three favorite . . . phrases." (*Id.* at 299.)

Fellow employees Clint Tittle ("Tittle") and Bill Clark confirmed that Pinkard directed racial epithets at Hobbs. (Tittle Decl., PX 2, at ¶¶ 2-4; Clark Decl., PX 2, at ¶ 2.) Further, Tittle stated that Pinkard referred to Hobbs in such terms outside Hobbs's presence and that Tittle told Hobbs of such remarks. (Tittle Decl., PX 2, at ¶ 4.) According to Hobbs, other employees told him that Pinkard was referring to him as "nigger" outside his presence. (Hobbs Decl., PX 2, at ¶ 1.)

Plant Manager Dale McGough confirmed that Pinkard may have used the word "nigger" in the workplace and told racist jokes. (McGough Dep., PX 15, at 30-31, 39, 42.) McGough, however, described Pinkard's use of such terms as "passing-by" speech, not directed at anyone in particular. (*Id.* at 31, 39.) McGough and Westmoreland also testified that Hobbs

33

contemporaneously complained about Pinkard's use of such terms. (McGough Dep. at 34; Westmoreland Dep., PX 19, at 152-53.)

According to Hobbs, Pinkard continued to curse at him constantly and Hobbs's co-workers continued to inform Hobbs that Pinkard was calling him "nigger" outside his presence. (Hobbs Dep., PX 12, at 377-82, Tittle Decl., PX 2, ¶4.)[21]  In early June 1996, Pinkard approached Hobbs from behind and jabbed Hobbs's leg with a sharpened metal file, giving him a small cut. (*Id.* at 191-200.)  Two weeks later, Hobbs resigned. (*Id.* at 423-24.)

Turning to the four factors set forth in *Mendoza*, the court is of the opinion that Hobbs has presented sufficient evidence to raise a question of material fact regarding the objective component of the alleged harassment.[22]  First, as to frequency, Hobbs testified that Pinkard "constantly" cursed at him and referred to him in racial terms. (Hobbs Dep., PX 12, at 299.)  As to the second and third factors, the court is of the opinion that a reasonable person could find the frequent use of such demeaning racial epithets both severe and humiliating. *See EEOC v. Beverage Canners, Inc*, 897 F. 2d 1067, 1068 (11th Cir. 1990).  Finally, the court is of the opinion that Hobbs's frequent complaints to management and management's subsequent offer to transfer him is sufficient evidence on which a reasonable jury could find that Pinkard's conduct interfered with Hobbs's job performance.  Consequently, viewing the evidence in a light most

---

[21]As noted above, defendants cite Hobbs's deposition, (DX 7 at 379-80, 386), for the proposition that there were no further harassing incidents between January and June of 1996. The testimony actually states that during this time frame, Pinkard was cursing Hobbs to his face and calling him "damn smart ass nigger and stuff like that behind my back." (*Id.* at 379-81.)

[22]Neither party contends that Hobbs did not subjectively perceive the harassment as altering the terms and conditions of his employment.

favorable to Hobbs, the court finds that a genuine issue of material fact exists as to whether the complained of conduct was severe and pervasive enough to alter the terms and conditions of Hobbs's employment.

In establishing liability for harassment by a supervisor, however, the Supreme Court distinguished harassment culminating in a "tangible employment action" and harassment involving the "intangible harm of the indignity and humiliation caused by hostile work environment." *Coates v. Sundor Brands, Inc.,* 164 F.3d 1361, 1367 (11th Cir. 1999) (citing *Faragher,* 524 U.S. at 807; *Burlington Industries,* 524 U.S. at 765). Where there is an adverse tangible employment action taken by the supervisor coupled with evidence of harassment, the employer is vicariously liable. *Id.* However, where only intangible employment action by the supervisor is involved, an employer may assert an affirmative defense to preclude liability. To succeed on this defense, the employer must show (1) that the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and (2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Id.*

Consequently, due to this intervening precedent, the parties in this case must be afforded an opportunity to apply the facts of this case to the affirmative defense set forth in *Faragher* and *Burlington Industries*.[23] A briefing schedule will be set out in the Order accompanying this Memorandum Opinion.

_____

[23]The parties shall not re-visit any issues other than the applicability, if any, of the affirmative defense.

35

### *4.     Constructive Discharge*

To support a claim for constructive discharge, an employee must prove that his/her

working conditions were so intolerable that a reasonable person in the employee's shoes would

have felt compelled to resign. *Poole v. Country Club of Columbus, Inc.*, 129 F. 3d 551, 553

(11th Cir. 1997).

> The general rule is that if the employer deliberately makes an
> employee's working condition so intolerable that the employee is
> forced into an involuntary resignation, then the employer has
> encompassed a constructive discharge and is as liable for any
> illegal conduct involved therein as if it had formally discharged the
> aggrieved employee.

*Buckley v. Hospital Corp. of Am., Inc.*, 758 F.2d 1525, 1530 (11th Cir. 1985) (citations omitted).

A constructive discharge will generally not be found if the employer is not given sufficient time

to remedy the situation. *Kilgore v. Thompson & Brock Management, Inc.,* 93 F.3d 752, 754

(11th Cir. 1996).[24]

As outlined above in the harassment analysis, the evidence shows that Hobbs experienced

almost four years of cursing, racial epithets and some physical harassment. Further, the

undisputed evidence on the record is that Hobbs's complaints to McGough and Westmoreland

resulted in only a temporary cessation of such conduct. (Hobbs Dep., PX 12, at 227-38, 263-65,

271-76, 285-92.) Although there is some evidence that Hobbs was offered a more permanent

---

[24]The court's finding of a genuine issue of material fact as to the hostile working
environment does not automatically create the assumption that the environment was intolerable
for purposes of the constructive discharge analysis. *See, e.g., Underwood v. Northport Health
Services, Inc.,* 57 F. Supp. 2d 1289, 1303-05 (M.D. Ala. 1999) (rejecting defendant's argument
that the alleged harassment was not severe and pervasive enough to alter the terms and
conditions of employment but granting summary judgment on constructive discharge claim).

remedy through transfer, (*id.* at 285-95), given the conditions allegedly attached to this transfer, the court cannot find that the remedy was reasonable.

At the time he resigned, Hobbs was still experiencing cursing, physical harassment, and second-hand accounts of Pinkard's use of the word "nigger" when referring to Hobbs. (Hobbs Dep., PX 12, at 191-200, 377-82, Tittle Decl., PX 2, ¶4.) Moreover, such harassment must be considered in combination with the racial epithets that Pinkard directed to Hobbs personally. (Hobbs Dep., PX 12, at 299). Consequently, the court is of the opinion that a genuine issue of material fact exists as to whether conditions were so difficult or unpleasant that a reasonable person in Hobbs's shoes would have felt compelled to resign. *See Delph v. Dr. Pepper Bottling Co.*, 130 F. 3d 349, 356 (8th Cir. 1997) (holding that use of offensive racial epithets such as "nigger" constituted harassment sufficiently severe and pervasive enough to support a finding of constructive discharge).

## IV. CONCLUSION

Based on the foregoing, the court is of the opinion that the motion for summary judgment filed by Fontaine is due to be granted in part and denied in part. An Order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this __31st__ day of March, 2000.

Sharon Lovelace Blackburn

**SHARON LOVELACE BLACKBURN**
United States District Judge

37